**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                   )
KENNETH EBBE,                      )
                                   )
                Petitioner,        )
                                   )        Civil Action
v.                                 )        No. 19-10289-PBS
                                   )
CONCORDE INVESTMENT SERVICES, LLC; )
WESTMINSTER FINANCIAL SECURITIES,  )
INC.; WESTMINSTER FINANCIAL        )
ADVISORY CORP.; RICHARD G. CODY;   )
and JILL M. CODY a/k/a JILL M.     )
TRAMONTANO,                        )
                                   )
                Respondents.       )
_____ )
```

**MEMORANDUM AND ORDER**

July 18, 2019

Saris, C.J.

**INTRODUCTION**

Petitioner Kenneth Ebbe brought claims in a Financial
Industry Regulatory Authority ("FINRA") arbitration proceeding
against his former investment brokers, Richard and Jill Cody;[1]
Richard Cody's former employer, Westminster Financial
Securities, Inc. and Westminster Financial Advisory Corp.
(collectively, "Westminster"); and both Codys' former employer,

---

[1]   Since the events at issue in this case, Jill Cody has
changed her last name to Tramontano. Because the parties and
documents refer to her as Jill Cody, the Court will follow suit.

Concorde Investment Services, LLC ("Concorde"). Ebbe alleged that Richard Cody falsely reported an inflated value for his investments for over a decade, which caused him to withdraw more money than he otherwise would have and miss the opportunity to seek employment to replenish his losses. After a four-day hearing, the FINRA arbitration panel issued an award for $286,096 in compensatory damages against the Codys jointly and severally but denied relief against Westminster and Concorde.

Ebbe moves to confirm the award against the Codys. He also seeks to vacate the denial of relief against Westminster and Concorde on the basis that the panel acted in manifest disregard of the law by not finding the companies liable for the Codys' misconduct via respondeat superior. In response, Westminster and Concorde both cross-move to confirm the panel's denial of relief against them. In a pro se answer, which the Court construes as a motion to vacate, Jill Cody alleges she did not receive notice of the arbitration until after the panel issued its award.

After hearing and supplemental briefing concerning Jill Cody's notice of the arbitration, the Court **ALLOWS** Ebbe's motion to confirm the arbitration award against Richard Cody and Jill Cody (Docket No. 1), **DENIES** Ebbe's motion to vacate the award against Concorde and Westminster (Docket No. 1), **DENIES** Jill Cody's motion to vacate (Docket No. 34), **ALLOWS** Concorde's

2

motion to confirm (Docket No. 36), and **ALLOWS** Westminster's motion to confirm (Docket No. 40).

**FACTUAL BACKGROUND**

### I.   Kenneth Ebbe and Richard Cody

Ebbe is a resident of Rockland, Massachusetts. He worked for Verizon from 1969 until he accepted an early retirement in 2002. Upon retirement, he cashed out the entirety of his pension and 401k, a total of $498,000. He hired Richard Cody, an investment professional at Leerink Swann who was recommended by a friend and former colleague at Verizon, to manage the money. Ebbe maintained his investments with Cody after Cody moved to GunnAllen Financial in 2005.

Starting in 2002, Ebbe received monthly distributions from his account of around $3,000 after tax withholding. Once he began receiving Social Security benefits in 2009, he reduced his distributions to around $2,500 per month. He also made withdrawals totaling approximately $22,000 for one-time expenses.

Throughout their relationship, Ebbe and Cody met a few times a year for an account review. During these reviews, Cody told Ebbe his investments were holding their value at around $500,000 and that he was only withdrawing interest from his account. In reality, Ebbe's account principal steadily declined while Cody was advising him. Although Ebbe received periodic

account statements from Cody's employers with accurate information about his account value, he did not understand them and told Cody he was relying on him to provide an accurate picture of his financial situation. Cody told Ebbe that these account statements did not include all of his investments.

On January 11, 2008, FINRA's Department of Enforcement suspended Cody for a year and imposed a fine for failing to recommend suitable investments to his clients and providing them with misleading monthly statements. Cody v. SEC, 693 F.3d 251, 256-57 (1st Cir. 2012). Ebbe did not know about these penalties until late 2016.

## II.  **Westminster**

In 2010, Cody began working at Westminster, a broker-dealer and financial advisory firm headquartered in Ohio. Ebbe's account value, which Cody transferred to Westminster, was around $144,000 at the time. Ebbe alleges that Cody continued to misrepresent the value of the principal while his account was with Westminster, but he did not produce documentary evidence at the arbitration hearing of any misrepresentations during this period. Ebbe never spoke with anyone from Westminster except for Cody, even though he noticed discrepancies between Westminster's periodic statements and Cody's representations about his account value. Westminster did not have any issues with Cody during his

employment but terminated him when his FINRA suspension began in early 2013.

## III. **Concorde**

Cody moved Ebbe's account to Concorde, another broker-dealer and financial advisory firm headquartered in Michigan, in January 2013. Ebbe's account had a value of around $59,000 at the time. Cody began his one-year FINRA suspension the same month, so Jill Cody, his wife and also a new investment professional at Concorde, took over management of his accounts, including Ebbe's. Since Concorde knew Jill Cody was managing her husband's accounts during the suspension, the company investigated to ensure she was qualified to do so and conducted a surprise inspection of her office. Concorde found no issues with her management of her husband's accounts and received no complaints from clients.

Despite his suspension, Richard Cody communicated with Ebbe about his investments throughout 2013, and they met multiple times during the year. Cody formally joined Concorde once his suspension ended in February 2014. Nevertheless, Jill Cody continued as the listed investment professional on Ebbe's account during the entire period it was managed by Concorde. Ebbe was unaware Jill Cody was his listed investment professional, although the periodic statements he received from

Concorde included her name. Ebbe only spoke with Jill Cody once, when she answered the telephone on behalf of her husband.

During this period, Richard Cody produced a number of false documents that inflated the value of Ebbe's account. For example, he gave Ebbe a false 1099 tax form for the year 2015. In the spring of 2016, Cody visited Ebbe at his home and showed him the top corner of a piece of paper in his briefcase listing an account value of around $489,000. Ebbe requested a copy of the document, but Cody never gave it to him. The actual value of Ebbe's account at this time was less than $100.

In 2015, Concorde received an unrelated complaint about the Codys that triggered an investigation of their business. Concorde discovered that Richard Cody had contacted clients during his suspension and that Jill Cody likely knew about it and did not report it. Concorde terminated the Codys in July 2016. In September 2016, after receiving a late distribution from his account, Ebbe called Concorde and was informed his account value was $0.

## IV.  **FINRA Arbitration**

Ebbe initiated an arbitration with FINRA against Richard and Jill Cody, Concorde, Westminster, and others on August 1, 2017. His statement of claim alleged negligence, breach of fiduciary duty, and violations of various securities laws and regulations. It did not specifically allege that Westminster and

Concorde were liable via respondeat superior. Pursuant to the rules for FINRA customer arbitrations, FINRA sent a letter to Jill Cody on August 7, 2017 notifying her that she had been named as a respondent and explaining the process for defending herself. FINRA used the address listed on her "Central Registration Depository" ("CRD") record: 409 Captain's Way in Neptune, New Jersey.[2] On August 23, 2017, FINRA notified Ebbe's attorney that it had not perfected service on Jill Cody at the Captain's Way address, likely because she had moved elsewhere in Neptune. Ebbe's attorney attempted to locate her new address but, as she had changed her last name, was unable to do so. Neither of the Codys responded to the statement of claim or appeared at the evidentiary hearing.[3]

A panel of three arbitrators presided over a four-day evidentiary hearing from October 16 to 19, 2018. During the hearing, Ebbe argued that Concorde and Westminster were liable on a number of grounds, including for Richard Cody's misconduct under the doctrine of respondeat superior. He noted that communicating with clients about their account values was part

---

[2]     The CRD is a centralized database for information on individuals involved in the securities industry. See Karsner v. Lothian, 532 F.3d 876, 880 & n.2 (D.C. Cir. 2008).

[3]     Richard Cody has pled guilty to investment advisor fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17 and making a false declaration under oath in violation of 18 U.S.C. § 1623(a). He is also a defendant in a pending SEC civil enforcement action.

of Cody's job responsibilities and therefore his misrepresentations were within the scope of his employment. He also briefly mentioned in his closing argument that Concorde should be held vicariously liable for Jill Cody's conduct as well.

Both Westminster and Concorde responded that Cody's conduct was outside the scope of his employment because he was subject to heightened supervision at both companies and was not authorized to misrepresent account values to clients. Westminster also argued that Ebbe presented no documentary evidence of any misrepresentations while it managed his account and that all the statements it provided Ebbe accurately reflected his account activity and value. Concorde argued that it was not liable because Jill Cody, not Richard Cody, was the listed representative on Ebbe's account and Ebbe suffered most of his financial losses before Cody transferred his account to Concorde in 2013.

Ebbe requested compensatory damages of $144,000, the amount he continued to withdraw after his account moved to Westminster on the false assumption his withdrawals were not reducing principal; lost opportunity damages of $374,400 based on the income he could have earned over six years if he had not falsely believed he had half a million dollars in his account; and

punitive damages of between $200,000 and $300,000 against each respondent.

On November 20, 2018, the panel issued the following award:

1. Respondents Richard Grant Cody and Jill M. Cody are jointly and severally liable for and shall pay to [Ebbe] the sum of $286,096.00 in compensatory damages.

2. [Ebbe's] claims against Concorde, Westminster Financial, and Westminster Advisory are denied.

3. [Ebbe's] request for attorneys' fees is denied.

4. [Ebbe's] request for punitive damages is denied.

5. Any and all claims for relief not specifically addressed herein are denied.

Dkt. No. 2-3 at 4. The panel provided no explanation for its award but did note that Jill Cody was properly served with the statement of claim and received adequate notice of the hearing.

On February 14, 2019, Ebbe filed a motion to vacate in part and confirm in part the arbitration award in the United States District Court for the District of Massachusetts. He asks the Court to confirm the award of $286,096.00 against the Codys and vacate the denial of relief against Westminster and Concorde. Ebbe argues that the arbitrators acted in manifest disregard of the law when they declined to find Westminster and Concorde liable for the Codys' misconduct under the doctrine of respondeat superior. Westminster and Concorde oppose Ebbe's motion to vacate and cross-move to confirm the award. Jill Cody

filed a pro se answer stating that she did not know about the arbitration until she received notice of Ebbe's motion in February 2019. Richard Cody has not responded to Ebbe's motion.

**STANDARD OF REVIEW**

Pursuant to the Federal Arbitration Act ("FAA"), a party to an arbitration may apply within one year for a judicial order confirming the award. 9 U.S.C. § 9. Upon receipt of such an application, unless the court vacates, modifies, or corrects the arbitration award pursuant to 9 U.S.C. §§ 10-11, it must confirm the award. Ortiz-Espinosa v. BBVA Sec. of P.R., Inc., 852 F.3d 36, 42 (1st Cir. 2017).  However, a "federal court's authority to defenestrate an arbitration award is extremely limited." First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d 7, 11 (1st Cir. 2015). Courts do not "hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts," even "where such error is painfully clear," Ortiz-Espinosa, 852 F.3d at 48 (quoting Advest, Inc. v. McCarthy, 914 F.2d 6, 8 (1st Cir. 1990)), nor do they "revisit the arbitrators' ultimate determination of whether or not to impose liability," id. At issue in this case are two grounds for vacating an arbitration award.

**I.   Manifest Disregard of the Law**

First, under the manifest disregard doctrine, a court may vacate an arbitration award if it is "(1) unfounded in reason

10

and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact." Mountain Valley Prop., Inc. v. Applied Risk Servs., Inc., 863 F.3d 90, 95 (1st Cir. 2017) (quoting McCarthy v. Citigroup Glob. Mkts. Inc., 463 F.3d 87, 91 (1st Cir. 2006)). The doctrine applies when "the arbitrator recognized the applicable law, but ignored it." Raymond James Fin. Servs., Inc. v. Fenyk, 780 F.3d 59, 64 (1st Cir. 2015) (quoting Bangor Gas Co. v. H.Q. Energy Servs. (U.S.) Inc., 695 F.3d 181, 187 (1st Cir. 2012)). To succeed on a manifest disregard argument, the party challenging the award must point to "some showing in the record, other than the result obtained, that the arbitrator[] knew the law and expressly disregarded it." Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 124 (1st Cir. 2008) (alteration in original) (quoting Advest, 914 F.2d at 9).

An arbitrator is "under no compulsion" to provide a written decision, Zayas v. Bacardi Corp., 524 F.3d 65, 70 (1st Cir. 2008), and where an arbitrator gives no reasons for the award, the burden on the party seeking vacatur for manifest disregard is especially heavy, see Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 240 (1st Cir. 1995) ("[W]hen the arbitrators do not give their reasons, it is nearly impossible for the court to

11

determine whether they acted in disregard of the law."
(quotation omitted)). A party seeking vacatur cannot merely
point to what he perceives to be an erroneous result. See id.
Instead, in the absence of a written decision, he must show that
"the governing law [had] such widespread familiarity, pristine
clarity, and irrefutable applicability" that the arbitrator must
have "kn[own] the rule and, notwithstanding, swept it under the
rug." Advest, 914 F.2d at 10. "If there is even a barely
colorable justification for the outcome reached" that can be
inferred from the record, a court must confirm the award. Bear,
Stearns & Co. v. 1109580 Ontario, Inc., 409 F.3d 87, 91 (2d Cir.
2005) (quoting Willemijn Houdstermaatschappij, BV v. Standard
Microsys. Corp., 103 F.3d 9, 13 (2d Cir. 1997).

In Hall Street Associates, L.L.C. v. Mattel, Inc., the
Supreme Court held that the FAA provides the exclusive grounds
for vacating an arbitration award. 552 U.S. 576, 578 (2008).
After Hall Street, the First Circuit has expressed doubt about
the continuing validity of the judicially created manifest
disregard doctrine but has declined to decide the issue where
the party challenging the award fails to meet the high burden of
showing manifest disregard. See Mountain Valley, 863 F.3d at 94-
95. Because the arbitrators did not act in manifest disregard of
the law in this case, the Court follows the First Circuit in
assuming the validity of the doctrine and need not address

Westminster's and Concorde's arguments as to why the manifest disregard doctrine is no longer a basis for vacatur.

## II.  **Fairness**

Second, arbitration proceedings must satisfy "the minimal requirements of fairness" under due process. Ramirez-de-Arellano v. Am. Airlines, Inc., 133 F.3d 89, 91 (1st Cir. 1997) (quoting Sunshine Mining Co. v. United Steelworkers of Am., 823 F.2d 1289, 1295 (9th Cir. 1987)). A fair proceeding requires "(1) notice, and (2) an opportunity to present relevant evidence and arguments." Doral Fin. Corp. v. García-Vélez, 725 F.3d 27, 32 (1st Cir. 2013). Actual notice of a pending proceeding is not necessary to satisfy due process. See Jones v. Flowers, 547 U.S. 220, 226 (2006). Instead, notice need only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 272 (2010) (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950)).

Courts have not settled on how to treat claims of inadequate notice of an arbitration in a proceeding to vacate an award under the FAA. See 21st Century Fin. Servs., L.L.C. v. Manchester Fin. Bank, 747 F.3d 331, 336 n.8 (5th Cir. 2014) (declining to decide whether "insufficient notice constitutes a

13

proper ground for vacatur" but recognizing the argument that it
fell within 9 U.S.C. § 10(a)(1) or § 10(a)(4)); Gingiss Int'l,
Inc. v. Bormet, 58 F.3d 328, 332 (7th Cir. 1995) (refusing to
vacate on the grounds of inadequate notice, which is not listed
in "the exclusive grounds for setting aside an arbitration
award" under 9 U.S.C. § 10(a), but proceeding to analyze the
inadequate notice argument as possible arbitrator misconduct
under 9 U.S.C. § 10(a)(3)); Int'l Techs. Integration, Inc. v.
Palestine Liberation Org., 66 F. Supp. 2d 3, 11 (D.D.C. 1999)
(explaining that the FAA would not "foreclose a court from
vacating an arbitrator's award where a party was never served
with a single notice, and where that party had no constructive
notice or other knowledge of the arbitration"); cf. Doral Fin.
Corp., 725 F.3d at 31-32 (subsuming the fair hearing requirement
under 9 U.S.C. § 10(a)(3), at least for evidentiary issues). As
with the manifest disregard doctrine, the Court assumes without
deciding that a court can vacate an arbitration award due to
inadequate notice because FINRA's attempt to serve Jill Cody
comported with due process.

## DISCUSSION

### I.   Ebbe's Motion to Vacate

#### A.   Respondeat Superior

The doctrine of respondeat superior renders an employer
"vicariously liable for the torts of its employee . . .

14

committed within the scope of employment." Lev v. Beverly
Enters.-Mass., Inc., 929 N.E.2d 303, 308 (Mass. 2010) (quoting
Dias v. Brigham Med. Assocs., Inc., 780 N.E.2d 447, 449 (Mass.
2002)). To prevail on a claim under respondeat superior, the
plaintiff must establish "both that (1) an employer-employee
relationship existed and (2) the alleged tortious conduct fell
within the scope of employment." Doe v. Medeiros, 266 F. Supp.
3d 479, 484 (D. Mass. 2017) (citing Dias, 780 N.E.2d at 450-51).
An employer's liability via respondeat superior "arises simply
by the operation of law and is only derivative of the wrongful
act of the" employee. Merrimack Coll. v. KPMG LLP, 108 N.E.3d
430, 438 (Mass. 2018) (quoting Elias v. Unisys Corp., 573 N.E.2d
946, 948 (Mass. 1991)). An employer itself need not act
wrongfully to be held liable for the tort of an employee
committed within the scope of employment. See id.

        An employee's conduct "is within the scope of employment if
it is of the kind he is employed to perform, if it occurs
substantially within the authorized time and space limits, and
if it is motivated, at least in part, by a purpose to serve the
employer." Lev, 929 N.E.2d at 308 (alterations omitted) (quoting
Mosko v. Raytheon Co., 622 N.E.2d 1066, 1068 (Mass. 1993)). To
satisfy the motivation prong, the plaintiff need only show that
the employee acted in part to benefit his employer, even if his

"predominant motive . . . [was] to benefit himself." <u>Pinshaw v. Metro. Dist. Comm'n</u>, 524 N.E.2d 1351, 1356 (Mass. 1988).

An employer does not automatically prevail on a respondeat superior claim if the employee acts beyond the strict confines of his employment duties or even acts in a way the employer has expressly prohibited. <u>Id.</u>; <u>see also</u> <u>McIntyre ex rel. Estate of McIntyre v. United States</u>, 545 F.3d 27, 39 (1st Cir. 2008) (applying Massachusetts law and "recogniz[ing] that a principal may be responsible for conduct customarily within its agent's scope of employment 'even though it is established fact that the act was forbidden by the principal.'" (quoting <u>United States v. Potter</u>, 463 F.3d 9, 26 (1st Cir. 2006))). Nevertheless, an employee's designated duties are relevant in determining whether the conduct is within the scope of employment. <u>See</u> <u>McIntyre</u>, 545 F.3d at 39 (listing "a number of factors to consider in determining whether unauthorized conduct is sufficiently similar or incidental to authorized conduct to be within the scope of employment").

## B.   Westminster

Ebbe argues that the panel acted in manifest disregard of the law in denying relief against Westminster because the evidence clearly demonstrated that Richard Cody was acting within the scope of his employment when he misrepresented Ebbe's account value to him. Ebbe correctly notes that even intentional

16

torts such as fraud can be within the scope of employment for the purposes of respondeat superior and that an employee need only act in part with the intent of benefiting his employer. Ebbe's argument that Westminster is vicariously liable for Cody's misconduct while he worked at the company is strong.

However, as Ebbe conceded at the hearing, one plausible explanation of the award is that the panel found that Cody did not engage in misconduct while employed at Westminster. The $286,096 award is approximately the value of Ebbe's account when Cody transferred it to Concorde, plus the $1,200 per week Ebbe sought as lost income for the period during which his account was with Concorde. This calculation, along with the fact that the panel held Jill Cody jointly and severally liable with Richard Cody even though she did not work at Westminster, suggests the panel determined that Richard Cody only engaged in misconduct while at Concorde, where Jill Cody also worked.

In reaching this result, the panel may have concluded that Ebbe presented insufficient evidence of Cody's misconduct while at Westminster. Ebbe relied solely on his own testimony about Cody's misrepresentations during this period and presented no corroborating testimony or documentation. The panel likely found this evidence to be insufficient. And with insufficient evidence of Cody's misconduct while at Westminster, the panel could not find Westminster vicariously liable either. See Gifford v.

Westwood Lodge Corp., 507 N.E.2d 1057, 1058 (Mass. App. Ct. 1987) ("Since the agents were not liable, [the principal] could not be vicariously liable."). This explanation for the panel's award is plausible and colorable. Accordingly, the panel did not act in manifest disregard of the law in denying relief against Westminster.

### C.   Concorde

Ebbe's argument that the panel acted in manifest disregard of the law in denying relief against Concorde is more complex. As just noted, the size and nature of the award suggest the panel found both Richard and Jill Cody liable for the period Ebbe's account was at Concorde. Concorde could be vicariously liable for the misconduct of either Cody because they were both employed by the company. Accordingly, Ebbe is entitled to vacatur of the award if he shows that the panel acted in manifest disregard by refusing to hold Concorde vicariously liable for the misconduct of either Richard or Jill Cody.[4]

### 1.   Richard Cody

For the first year Concorde managed Ebbe's account, Richard Cody served his FINRA suspension and was not even employed by

---

[4]    In addition to opposing Ebbe's manifest disregard argument on the merits, Concorde contends that Ebbe challenges the award on factual grounds, which are not subject to judicial second-guessing under any circumstances. Because the panel did not act in manifest disregard of the law in denying relief against Concorde, the Court need not address this argument.

Concorde. Because Cody was not an employee, Concorde cannot be vicariously liable for his misconduct in continuing to manage Ebbe's account during his suspension. Since Concorde employed Cody as an investment professional for the other two years, however, Ebbe presents a strong argument that Concorde is vicariously liable for some of Cody's misrepresentations about his account value. See, e.g., Smith v. Jenkins, 732 F.3d 51, 73 (1st Cir. 2013) (finding sufficient evidence to hold a law firm vicariously liable for the fraudulent real estate closings of its attorney because his "acts as the closing agent were within the purview of his job," the "closings took place at the [firm's] office during regular business hours," and his conduct "was motivated, at least in part, by a desire to serve [the firm's] interests," as the "firm received fees as the closing agent on both transactions").

The panel may, however, have determined that Richard Cody's fraudulent misrepresentations to Ebbe were outside the scope of his employment. Throughout the three-year period Ebbe's account was with Concorde, Jill Cody was designated as Ebbe's investment professional. Concorde never assigned Richard Cody to manage Ebbe's account. It is plausible the panel concluded that Cody's relationship with Ebbe was not part of his duties as a Concorde employee and were therefore outside the scope of his employment. While Ebbe presents a strong argument that Cody was engaged in

exactly the type of work he was hired to do when he communicated with Ebbe about his account, the law governing how an employer's delineation of an employee's duties affects whether the employee's conduct is within the scope of employment is not clear. See Potter, 463 F.3d at 26 (recognizing in the context of the similar agency principles at issue in corporate criminal responsibility that there is "a gray area" in which an employer's "restrictions, although not mechanically exculpatory of corporate liability, may well bear upon what is or is not within the scope of the agent's duties").

Though not convincing and perhaps an error of law, this explanation is a colorable justification for the panel's decision. The panel therefore did not act in manifest disregard of the law in declining to apply respondeat superior to hold Concorde vicariously liable for Richard Cody's misconduct.

### 2. Jill Cody

Ebbe's strongest argument is that the panel acted in manifest disregard of the law in not holding Concorde liable for Jill Cody's misconduct. It is undisputed that Jill Cody was an employee of Concorde throughout the three years Concorde managed Ebbe's account and that she was Ebbe's listed investment professional for the entire period. Properly managing Ebbe's account was therefore within the scope of her duties as a Concorde employee. She failed to do so by allowing Richard Cody,

during and after the period of his suspension, to communicate with and continue to make misrepresentations to Ebbe. Her decision to allow her husband to manage Ebbe's account was motivated at least in part to benefit Concorde through the fees Ebbe was paying. Concorde is therefore vicariously liable for her dereliction of a duty within the scope of her employment. The panel's decision not to hold Concorde vicariously liable was plain error. However, Ebbe has not met the extremely high standard of showing that the panel acted in manifest disregard of the law.

The First Circuit has explained that a panel acts in manifest disregard of the law when its award is "based on reasoning so palpably faulty that no judge . . . ever could conceivably have made such a ruling." Mountain Valley, 863 F.3d at 95 (quoting McCarthy, 463 F.3d at 91). Given the First Circuit's admonition that courts are not to correct even "painfully clear" errors by arbitrators, Ortiz-Espinosa, 852 F.3d at 48 (quotation omitted), manifest disregard of the law requires more than a showing of serious legal error. A party seeking to vacate an arbitration award for manifest disregard must instead show that the arbitrators were aware of the law and its applicability to the dispute but chose not to apply it. See Raymond James, 780 F.3d at 64; Ramos-Santiago, 524 F.3d at 124; see also Kashner Davidson Sec. Corp. v. Mscisz, 531 F.3d

68, 79 (1st Cir. 2008) (finding manifest disregard of the law
where the arbitration panel dismissed claims as a sanction
without first imposing lesser sanctions as required by the
"clear and unequivocal language" of a National Association of
Securities Dealers rule and where the panel "certainly knew" it
had not complied with this rule because it had "rejected
numerous requests for sanctions"). The First Circuit's test for
finding manifest disregard in the absence of a written decision,
i.e., that "the governing law [had] such widespread familiarity,
pristine clarity, and irrefutable applicability" that the
arbitrator must have "kn[own] the rule and, notwithstanding,
swept it under the rug," is a way of determining whether the
arbitrators expressly disregarded the law. Advest, 914 F.2d at
10.

The panel issued the equivalent of a default judgment
against Jill Cody after she failed to respond to the statement
of claim or appear at the hearing. Given the clear applicability
of respondeat superior, the panel denied relief against Concorde
either because it chose not to apply the law or because it did
not consider the ramifications of its default judgment. The
former explanation would constitute manifest disregard of the
law. The latter would not.

Ebbe has failed to meet his burden of demonstrating that
the former explanation is more likely than the latter. The

arbitration award, devoid of any reasoning, provides no help.
Neither Ebbe's statement of claim nor Concorde's answer mentions
common law respondeat superior. Ebbe has not submitted any
briefing provided to the arbitrators before or after the
hearing. He does not point to any statements by the arbitrators
during the four-day hearing that show they recognized the
applicability of respondeat superior to Jill Cody and Concorde's
employment relationship but chose to disregard it. While Ebbe's
attorney did mention once (in a conclusory fashion) that
Concorde should be held vicariously liable for Jill Cody's
conduct, this one reference during a four-day hearing does not
persuade the Court that the arbitrators expressly chose to
ignore Concorde's vicarious liability. More likely, the
arbitrators entered a default judgment against Jill Cody and,
giving little thought to matter, failed to consider the
consequences for Concorde's liability. Accordingly, while the
arbitrators plainly erred in failing to hold Concorde
vicariously liable for Jill Cody's misconduct, they did not act
in manifest disregard of the law.

## II.  Jill Cody's Motion to Vacate

Jill Cody did not respond to Ebbe's statement of claim or
appear at the FINRA arbitration hearing. In her pro se answer in
this proceeding, she explains that she did not know about the
arbitration until February 2019 when she was served with Ebbe's

motion, well after the panel issued its award. In light of the liberal construction given to pro se pleadings, <u>Donovan v. Maine</u>, 276 F.3d 87, 94 (1st Cir. 2002), the Court construes her answer as a motion to vacate the arbitration award on the basis that she lacked adequate notice of the arbitration in violation of due process.[5]

Pursuant to the rules governing FINRA customer arbitrations, FINRA is responsible for notifying respondents when a statement of claim is filed. <u>See</u> FINRA Code of Arbitration Procedure for Customer Disputes § 12302(c) (2019). When an individual registered with FINRA is named as a respondent, FINRA "serve[s] the Claim Notification Letter . . . directly at the person's residential address or usual place of abode." <u>Id.</u> § 12301(a). FINRA sent notice of the arbitration proceedings to Cody at 409 Captain's Way in Neptune, New Jersey, which was the address listed in her record in FINRA's CRD system.

A "method chosen by the parties to receive notice . . . cannot be deemed to offend due process." <u>First State Ins. Co. v. Banco de Seguros del Estado</u>, 254 F.3d 354, 357 (1st Cir. 2001); <u>see also</u> <u>Gingiss Int'l</u>, 58 F.3d at 332-33 (declining to vacate

---

[5]   The panel stated in its award that FINRA properly served Cody with the statement of claim and provided her adequate notice of the hearing. The Court agrees so does not address the level of deference owed to the panel's conclusion.

an arbitration award for inadequate notice where the parties
agreed to abide by the American Arbitration Association rules
and service was effectuated in accordance with those rules);
Bos. Celtics Ltd. P'ship v. Shaw, 908 F.2d 1041, 1046 (1st Cir.
1990) (holding that notice that the arbitrators determined
"substantially complied with the contractual notice provision"
in the parties' agreement was not fundamentally unfair). Cody
agreed to abide by FINRA's rules when she became a registered
broker. See FINRA By-Laws of the Corporation art. V, § 2(a)(1)
(2019) ("FINRA By-Laws"); FINRA Rules § 0140(a) (2019).

When Concorde terminated Cody in July 2016, FINRA notified
her that she needed to update her address in the CRD system if
she moved within two years. See FINRA By-Laws art. V, § 2(c)
(requiring that registered representatives keep their
registrations "current at all times" by filing amendments "not
later than 30 days after learning of the facts or circumstances
giving rise to the amendment"). It appears she failed to do so.
FINRA attempted to serve her at the old residential address
listed in the CRD system pursuant to the rules to which she had
consented.

In many cases where courts have rejected claims of
defective notice of an arbitration, the party seeking vacatur
had actual notice of the proceedings. See 21st Century, 747 F.3d
at 337-38; Bos. Celtics, 908 F.2d at 1046; cf. Choice Hotels

Int'l, Inc. v. SM Prop. Mgmt., LLC, 519 F.3d 200, 210 (4th Cir. 2008) (vacating an arbitration award where a party did "not receive[] notice of the arbitration proceedings in accord with the" contract and did "not otherwise receive[] notice"). Ebbe provides no evidence that Cody knew about the arbitration before February 2019, and Cody explains in an affidavit that she did not reside at 409 Captain's Way in August 2017 when Ebbe filed his statement of claim. FINRA even notified Ebbe that its attempts to perfect service on Cody had failed.

Actual notice of a pending proceeding, however, is not necessary to satisfy due process. See Jones, 547 U.S. at 226. Cody consented to service at the residential address on file with FINRA. She also agreed to keep that address updated, which she did not do. Ebbe attempted to locate another address for her but was unable to do so because he was unaware she had changed her last name to Tramontano. In light of Cody's consent to the FINRA rules and the understandable difficulty Ebbe faced in finding her new address, FINRA's attempt to serve Cody at 409 Captain's Way was "reasonably calculated, under all the circumstances, to apprise [her] of the pendency of the action and afford [her] an opportunity to present [her] objections." United Student Aid Funds, 559 U.S. at 272 (quoting Mullane, 339 U.S. at 314); see also Harris v. Wells Fargo Clearing Servs., LLC, No. 18 Civ. 4625 (GBD), 2018 WL 6523384, at *4, *6

26

(S.D.N.Y. Nov. 26, 2018) (collecting cases holding that FINRA properly serves a registered representative with notice of a statement of claim if it uses the residential address she listed with FINRA and concluding that such service did not violate due process), appeal withdrawn, No. 19-60 (2d Cir. Apr. 12, 2019).

## III. **Motions to Confirm**

Westminster and Concorde move to confirm the denial of relief against them, and Ebbe moves to confirm the $286,096 award against Richard Cody and Jill Cody. In the absence of a reason to vacate, modify, or correct an arbitration award, a district court must confirm it. Ortiz-Espinosa, 852 F.3d at 42. Having rejected Ebbe's and Jill Cody's arguments for vacating certain aspects of the award, the Court must confirm the award in its entirety.

**ORDER**

Ebbe's motion to confirm the arbitration award against Richard Cody and Jill Cody (Docket No. 1) is **ALLOWED**, Ebbe's motion to vacate the award against Concorde and Westminster (Docket No. 1) is **DENIED**, Jill Cody's motion to vacate (Docket No. 34) is **DENIED**, Concorde's motion to confirm (Docket No. 36) is **ALLOWED**, and Westminster's motion to confirm (Docket No. 40) is **ALLOWED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge